## BIGGS v. MOODY.
### Patent Appeal No. 3100.

Court of Customs and Patent Appeals.
May 22, 1933.

H. A. Toulmin and H. A. Toulmin, Jr., both of Washington, D. C., for appellant.

Edward A. Hathaway, of Philadelphia, Pa. (Clifton V. Edwards, of New York City, of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GARRETT, Associate Judge.

In this appeal from a decision of the Board of Appeals of the United States Patent Office there are involved eleven counts of an interference upon which priority was awarded to Moody. The interference was dissolved as to one count (No. 7) and it is not involved here.

The subject-matter of the counts is runners for hydraulic turbines. More specifically, the issues here relate, principally, to the shape and position, with reference to each other and to the axis of the hub, of the blades or buckets on the runner, or rotor, of turbines.

Counts 4 and 9 appear to be fairly representative and are here quoted:

"Count 4. In a water wheel, a runner, a hub, a plurality of overlapping blades arranged at an increasing angle from the periphery to the hub, the greater angle being at the hub, said angles being measured with respect to the major axis of the runner.

"Count 9. In a water wheel, a runner having a hub and a plurality of blades, said blades being pitched at an angle to a horizontal plane at right angles to the major axis of the runner and being progressively pitched from the periphery to the hub and progressively pitched from the trailing edge to the leading edge, said blades partially overlapping one another to form a water cell between them, whereby the water may pass therebetween having its angle of direction of motion gradually changed, said buckets being concave on the under surface and convex on the upper surface when viewed on a straight line parallel to the major axis of the runner and located at an angle to the radius of the runner and concave on the upper surface and convex on the lower surface when viewed in section on a cylindrical plane parallel to the axis of the runner."

The counts, in the aggregate, call for blades or buckets having what Biggs refers to in his brief as "a reverse curvature," the buckets to be "progressively overlapping from periphery to hub." It is claimed that these features result from the particular structure disclosed by the counts. Details are described in different forms of language, ref-

erences being made to "leading edges arranged with the greater angle at the leading edge with respect to the trailing edge," and "overlapping buckets to form a cell."

In the oral argument it was stated that four features are called for, which, it was said, could be defined in terms as follows: (a) "reverse curvature"; (b) "cylindrical periphery"; (c) "overlapping blades" and (d) "diagonality of blades."

All these terms, as we understand it, are deduced from the structural descriptions recited in the respective counts. The "reverse curvature" seems to be called for in all the counts at issue, except 4, 5, and 8. "Cylindrical periphery," as we construe the term, seems to be required by a number of the counts; "overlapping blades" are specified in counts 2, 3, 4, 6, 8, 9, 10, 11, and 12, some of these having limitations to be later referred to, and "diagonality of blades" is present in counts 4, 5, 6, 8, 10, 11, and 12. Certain of the counts are specific as to "overlapping blades from periphery to hub"; also certain of them have a limitation to blades so overlapping "continuously" as to "form a water cell therebetween."

Biggs is a patentee, having received patent No. 1,613,816 January 11, 1927, upon his application filed March 30, 1925. On those dates Moody had pending in the Patent Office an application, Serial No. 373,545, filed April 13, 1920, for patent on hydraulic turbines. Following the issuance of the patent to Biggs, Moody made certain amendments to his specification and drawings and copied the claims which became the counts at issue. The interference was declared May 15, 1928.

The preliminary statement of Biggs alleged a date of conception later than Moody's filing date, and Biggs was put upon notice to show cause why judgment upon the record should not be entered against him. In response Biggs moved to dissolve the interference on the ground, among others, that Moody had not the right to make the counts, because, it was alleged, his application failed to disclose the invention. The motion finally was heard by the tribunals of the Patent Office upon this one ground, and that is the sole ground presented before us.

The Law Examiner denied the motion as to counts 1 and 2, but sustained it as to all the remainder. Moody took an interlocutory appeal and the Board of Appeals reversed the Law Examiner as to counts 3–6, inclusive, and 8–12, inclusive, but affirmed as to count 7. There was no interlocutory appeal by Biggs as to counts 1 and 2. Following the decision of the board, the Examiner of Interferences entered judgment upon the record, awarding priority to Moody upon all the counts, except count 7. Upon appeal the Board of Appeals affirmed the decision of the Examiner of Interferences. Thereupon the appeal to this court was prosecuted.

The Moody application was pending in the Patent Office for almost five years before the filing of the application of Biggs and for almost seven years before the grant of the Biggs patent in which the counts originated. Because of this circumstance, counsel for Biggs, in their brief, intimate that the Moody application was kept in the Patent Office for the purpose of "catching patentees" and, we suppose, involving them in interferences with a view of acquiring as extensive a monopoly as possible upon all improvements in the devices peculiar to this field, which devices, in comparatively recent years, have become matters of increased importance and concern. It is argued that for this reason appellee forfeited the right to patent.

The record, however, does not disclose anything, except the delay itself, from which any such inferences might properly be drawn, and there may be many explanations of delay which render it entirely consistent with legitimate procedure and good faith. The court does not feel justified in considering further that aspect of the case.

The subject-matter to which the Biggs' brief devotes the greater portion of its space is embraced in the limitation set forth in numerous of the counts, being expressed in count 1 as follows: " * * * A plurality of buckets which are concave on the upper surface and convex on the lower surface when viewed on a section taken on a cylindrical plane parallel to the major axis of the runner and convex on the upper surface and concave on the lower surface when viewed in a section taken on a straight plane at an angle to the radius of the runner."

This is the element so often alluded to in the brief for Biggs as "reverse curvature" in the blades—"blades" and "buckets" being used interchangeably in the counts.

This phraseology of the counts seems to us to be somewhat cryptic, but, as we understand it, it means that, when a blade is viewed from one angle, a section of the blade will appear to be concave on top and convex underneath, but when viewed from another angle that same section will appear to be convex on top and concave underneath. The language, in our opinion, does not mean that one section of the blade is actually con-

vex on top and another section of it convex underneath, and vice versa in each instance, but relates to the appearance of the same section of the blade when looked at from different angles. In other words, it seems to us that the correct construction of the count is that the matter of so-called reverse curvature is one of appearance, dependent upon the angle of vision of the observer, and not one of actual structural form.

Counsel for Biggs do not agree that "appear," as used in some of the counts, means that the blades merely seem to have the formation described, but insist that it means the actual formation of the blade.

Such an actual formation does not seem to us to be a physical possibility, if the language of the count refers, as we think it obviously does, to the same section, or part, of the blade. In the very nature of things, a particular section of the blade could not physically be both convex and concave on both sides, although it may be possible so to shape it as that, when looked at from different angles, it will appear so. The model on file, made in accordance with the Biggs' drawings, seems to us conclusive upon this phase of the count.

We may add that an inspection of the Biggs' drawings and model does not convince us that Biggs shows actual physical alternation of concavity and convexity, even in different sections of his blades. The Board of Appeals points out, we think correctly, that such a structure would not produce an avowed result expressed in the Biggs' specification as follows: "* * * By arranging the cross section as illustrated and described, a neutral axis in the plane 22–23 of Figure 8 will be such that the areas of the bucket material above this axis will be in tension and those below in compression. For each blade or bucket there is a neutral plane relative to the compression and tension stresses in the blade material and any cross section of a blade will contain a neutral axis above which the fibrous stress is tension and below which it is compression."

This led the board to say: "* * * Moreover, such a reversal of curvature would not be consistent with the stated object of maintaining the portion of the blade above the neutral axis under tension and the portion below such axis under compression. If there be an actual reversal there would be neither tension nor compression at the point where the reversal occurs."

Under what we deem to be the proper interpretation of the counts, it must be held that there was no error in the board's finding upon the "reverse curvature" phase of the controversy, because, as to this, the counts are met by Moody's disclosures quite as fully as they are by the disclosures of Biggs.

The phrase "cylindrical periphery" is, apparently, used in argument to define a structural characteristic of the blades and their positioning which, we assume, is inherent in any device built in accordance with the count.

The geometrical definition of "periphery" given by Webster's New International Dictionary is, "The circumference or perimeter of a circle, ellipse or other closed curvilinear figure." The word conveys the idea of the "external boundary."

As applied to the counts in issue, it appears that there is required a structure in which the blades are so placed as that the outer ends thereof will, when the runner revolves, move in a cylindrical plane or along a circular line, or, it might mean that, taken at any point intermediate the intersection of blades and hub and the end of the blades, a circular line will be followed in the revolution. The pertinent counts, it seems, would respond to either requirement.

Whichever may be correct, we think this characteristic is equally as well disclosed in the drawings of Moody as in those of Biggs.

Upon the question of overlapping blades, there are certain distinctions in the counts which seem to us to require some particularity of analysis.

Count 2 speaks of the buckets as merely "being arranged to overlap one another."

Count 3 goes further and calls for buckets "arranged to overlap one another, the overlapping being progressively greater from the periphery to the hub."

Counts 5, 6, and 11 call simply for "overlapping blades."

Counts 8, 9, and 10 call for blades "partially overlapping one another to form a water cell therebetween," or "between them," count 8 having the additional limitation, "continuously"—that is, it calls for a partial and continuous overlapping.

Count 12 calls for "a plurality of overlapping buckets * * * said overlapping portions being progressively greater towards the hub."

That Moody shows a partial overlapping of blades is not subject to serious question and this, in our opinion, is sufficient to meet all the counts, so far as this element is concerned, except counts 3 and 8.

As to those two counts, we agree with the conclusion of the Law Examiner rather than with that of the Board of Appeals. The reasonable construction of the language "from periphery to hub" in count 3, we think, is that it requires overlapping blades—that is, that one blade shall overlap another blade—throughout their entire lengths. This Biggs shows and Moody does not.

The language of count 8 is "partially and continuously overlapping one another." The fair and reasonable construction of this language, in our opinion, is, as contended by Biggs, that it requires a partial overlapping of the edges of the blades, such overlapping to be continuous from end to end. Biggs discloses this, while Moody shows only an overlapping of the edges over the middle parts of the blades. In Moody there is no overlapping of the blades near the hub and near their outer ends.

The remaining feature of the controversy relates to the matter of the "diagonality of blades." This phrase is not used in the counts, but was used in argument to define the structure described by such expressions as that in count 9, supra, reading: "* * * Said blades being pitched at an angle to a horizontal plane at right angles to the major axis of the runner and being progressively pitched from the periphery to the hub and progressively pitched from the trailing edge to the leading edge. * * *"

"Leading edge" refers to that edge of the blade which is the forward one as the runner revolves. The "trailing edge" is the rear one. The Biggs disclosure is of blades so placed on the runner as that the leading edge, when the runner revolves to the right, is lower than the trailing edge. In other words, the blades are "tilted."

Also Biggs discloses blades which leave the hub at a certain angle, with reference to the axis of the hub, which angle decreases in its relation to the said axis, the decrease being gradual from hub to periphery by reason of the form of the blades. This latter feature is referred to in the opinion of the Board of Appeals, and in the argument before us, as "longitudinal concavity."

It is noted that not all the counts in which the limitation now under discussion is involved call for a decrease in angle between hub and periphery. Counts 8, 9, and 10 require only that the blades be "progressively pitched." Counts 4, 5, and 6, however, are specific in the requirement that the greater angle be at the hub.

A study of the Moody drawings, particularly his figure 10, together with the specifications and models of his respective devices, leads us to the conclusion that he discloses the tilted blades and so meets that element of the counts which requires progressive pitching from leading edge to trailing edge, but the shape of Moody's blades, and the manner in which they are positioned upon the hub, do not seem to us to meet the requirement of such counts as call for "an increasing angle from periphery to hub." It seems quite apparent to us that the angle in Moody's blades, in its relation to the axis of the hub, is, at the periphery, as great as, or greater than, it is at the hub. So, in our opinion, Moody does not meet the requirement of an increasing angle, as specified in counts 4, 5, and 6.

The decision of the Board of Appeals is modified, being reversed as to counts 3, 4, 5, 6, and 8, and affirmed as to all others.